Filed 11/30/23  Borel v. City of Murrieta CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ANTHONY BOREL,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>CITY OF MURRIETA,<br><br>    Defendant and Respondent. | G062732<br><br>(Super. Ct. No. RIC2002687)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Sunshine S. Sykes and Craig Riemer, Judges.  Reversed and remanded with instructions.

Roberts Jeandron Law, Jeffrey Travis Roberts; Law Offices of Alan S. Yockelson and Alan S. Yockelson for Plaintiff and Appellant.

Horvitz & Levy, David M. Axelrad and Robert H. Wright; Bremer Whyte Brown & O'Meara, Tyler D. Offenhauser and Kevin B. Wheeler for Defendant and Respondent.

## INTRODUCTION

Anthony Borel was on a residential worksite in Murrieta (the City) the summer of 2019 when the home exploded due to a natural gas leak. Borel alleged the fire crew that responded to the report of a leak failed to establish a perimeter or evacuation zone around the leak area and allowed people to go in and near the home. He was amongst the people allowed to go near the home to retrieve his tools. While he was doing this, the homeowner asked the captain on the scene if she could enter the house to retrieve some personal items. Shortly after she entered, the home exploded and Borel was seriously injured. He seeks to recover damages for his injuries from, among others, the City of Murrieta.

In response to Borel's public entity negligence claim, the City successfully moved for summary judgment, on the ground its firefighters' conduct at the scene was subject to emergency services immunity under Health and Safety Code section 1799.107.[1] Section 1799.107 creates immunity for public entities and emergency rescue personnel for injuries caused when they take action to provide emergency services, so long as the actions are not performed in bad faith or with gross negligence.

We reverse. While we agree the City can invoke section 1799.107, we conclude there is sufficient evidence to create triable issues of material fact as to whether the firefighters acted with gross negligence.

## FACTS

On July 15, 2019, Borel was working as a solar panel installer for Horizon Solar. That morning, he was working on the roof of a residence located at 23562 Wooden Horse Trail in Murrieta when a coworker advised an underground gas line was

---

[1] All statutory references are to the Health and Safety Code unless otherwise indicated.

leaking along the side of the home.[2]  Borel got down from the roof and waited for further instructions.  His coworkers called 911 emergency services to report the leak.

The City's fire protection district responded to the call with personnel Captain Shad Chanley, Engineer Andy Stang, and Paramedic Randy Lopez arriving on scene at approximately 10:57 a.m.  They confirmed there was indeed gas leaking alongside the house and they waited for personnel from Southern California Gas company (the Gas Company) to come and remediate the problem.  The Gas Company arrived at around 11:23 a.m. and began working on the leak.  To remediate it, they had to shovel and jackhammer around the area of the leak.

Shortly thereafter, the Gas Company employees informed Captain Chanley that he and his crew could leave the scene, indicating the risk from the gas leak was low. Nonetheless, he decided to keep his crew at the scene "in order to continue to render aid as needed."  However, his team did not set up a perimeter around the home or evacuate the vicinity to keep the public away.  Instead, they stayed in the vicinity and watched the Gas Company attend to the leak.

A few minutes after noon, the owner of the house, a Mrs. Haaland, asked Captain Chanley if she could enter her residence in order to retrieve some personal items she needed.  Captain Chanley told her she could enter.  Five minutes later, the gas inside the house ignited, causing an explosion.  Unbeknownst to anyone at the scene, the gas had migrated from the exterior to the interior of the home.  Borel was standing within feet of the garage door when the house exploded, and was blown across the street.  He was knocked unconscious and suffered a serious head injury as well as burns to his body.

Borel filed a lawsuit against the City and the Gas Company for negligence. The City filed for summary judgment, citing section 1799.107 and arguing its firefighters were providing emergency services at the site of the gas leak.  The City further argued

---

[2]  There is some dispute as to how the gas leak occurred.  But for purposes of this motion, Borel was willing to concede the gas line was ruptured.

3

Borel could not show they acted in a grossly negligent or bad faith manner. The trial court agreed and granted summary judgment, from which Borel now appeals.

## DISCUSSION

Section 1799.107 became effective in 1984, and through it, the Legislature sought to provide a qualified immunity to public entities and emergency rescue personnel providing emergency services. (*Id.*, subd. (a).) The Legislature made explicit that the immunity was intended to encourage provision of emergency services by these entities in order to protect the public health and safety. (*Ibid.*) The statute defines "'emergency services'" in an expansive way – the term "includes, but is not limited to, first aid and medical services, rescue procedures and transportation, or other related activities necessary to insure the health or safety of a person in imminent peril." (*Id.*, subd. (e).) As such, the term "'emergency rescue personnel'" includes any member of a firefighting or fire protection entity, whether publicly or privately operated, so long as he or she is "actually engaged in providing emergency services[.]" (*Id.*, subd. (d).) Section 1799.107, subdivision (b) states in pertinent part that "neither a public entity nor emergency rescue personnel shall be liable for any injury caused by an action taken by the emergency rescue personnel acting within the scope of their employment to provide emergency services, unless the action taken was performed in bad faith or in a grossly negligent manner."

Borel takes aim at the two main determinations made by the trial court. First, its determination that immunity under section 1799.107 attached at all. Second, its conclusion that there was no triable issue concerning gross negligence of the firefighters. We conclude the trial court answered the first question correctly but erred as to the second. Even if the City met its burden to show section 1799.107 was applicable, Borel adequately raised a triable issue of material fact concerning gross negligence. The summary judgment motion should have been denied.

4

## I.         Summary Judgment and Section 1799.107

We independently review a grant or denial of summary judgment. (See *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67-68). The nature of, and requirements for, summary judgment have been discussed so many times in the case law as to become somewhat cliched. Nevertheless, the principles bear not only repeating, but thoughtful reflection in each case.

Summary judgment is appropriate if—and only if—the papers submitted to the court show there is no triable issue of material fact, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) Essentially, the summary judgment procedure helps save time if "there is no issue requiring a trial as to any fact" germane to the pleadings or necessary pursuant to the applicable law. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) If the facts germane to the action are undisputed, the court must decide the case as a matter of law. (See *Antonopoulos v. Mid-Century Ins. Co.* (2021) 63 Cal.App.5th 580, 593.) But if the court finds *any* issue of material fact to be tried, it can go no further; the motion must be denied. (See *D.E. Sanford Co. v. Cory Glass Etc. Co.* (1948) 85 Cal.App.2d 724, 726.) "An issue of fact becomes one of law and loses its 'triable' character *only if the undisputed facts leave no room for a reasonable difference of opinion*." (*Atlantic Mutual Ins. Co. v. J. Lamb, Inc.* (2002) 100 Cal.App.4th 1017, 1031, italics added.)

"[F]rom commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.[fn] That is because of the general principle that a party who seeks a court's action in his favor bears the burden of persuasion thereon. (See Evid. Code, § 500.)" (*Aguilar*, *supra*, 25 Cal.4th at p. 850.) Where the defendant is the moving party, it may meet this burden by either showing plaintiff cannot establish a necessary element of his case, or by establishing a complete defense thereto. (Code Civ. Proc., § 437c, subd. (o)(2).) In this case, the City attempted

5

to meet its burden by doing the latter; it sought to establish it is exempt from liability due to statutory immunity.

Unlike the burden of persuasion, the burden of production can shift on a summary judgment motion. The moving party generally bears the initial burden of production to show an absence of triable issues of material fact, and if successful, the burden of production shifts to the opposing party to make a prima facie showing of the existence of triable issues. (See *Aguilar*, *supra*, 25 Cal.4th at p. 850.) "A burden of production entails only the presentation of 'evidence.' (Evid. Code, § 110.) A burden of persuasion, however, entails the 'establish[ment]' through such evidence of a 'requisite degree of belief.' (*Id.*, § 115.) It would make little, if any, sense to allow for the shifting of a burden of persuasion. For if the moving party carries a burden of persuasion, the opposing party can do nothing other than concede." (*Aguilar*, *supra*, 25 Cal.4th at p. 850.)

But the burden of production can also shift where the applicable law provides for a rebuttable presumption, as noted earlier this year by the First District Court of Appeal in *Degala v. John Stewart Co.* (2023) 88 Cal.App.5th 158, 166-167 (*Degala*).) *Degala* involved application of the Privette doctrine of workplace injury liability. In our case, the burden shift takes place by operation of statute. Section 1799.107 explicitly states: "For purposes of this section, it shall be presumed that the action taken when providing emergency services was performed in good faith and without gross negligence. This presumption shall be one affecting the burden of proof." (*Id.*, subd. (c).) Thus, the City's moving burden of production was to show section 1799.107 applies; that the firefighters were "emergency rescue personnel acting within the scope of their employment to provide emergency services" at the time of the explosion. (*Id.*, subd. (b).) If they met that burden, Borel would bear the burden to produce evidence of bad faith or gross negligence.

Importantly though, the burden of *persuasion* remained with the City. And this burden impacted how the court was to view the evidence produced in making its determination. The court was required to consider all of the evidence, unless it sustained objections to any particular piece of evidence, and it also had to consider all inferences reasonably drawn from such evidence. (*Aguilar*, *supra*, 25 Cal.4th at p. 843.) Additionally, the evidence must be viewed "in the light most favorable to . . . the nonmoving party." (*Degala, supra,* 88 Cal.App.5th at p. 167.) The nonmoving party's evidentiary submissions and declarations are to be given liberal construction, while the moving party's submissions are strictly construed. And all "evidentiary doubts or ambiguities" must be resolved in favor of the nonmoving party. (*Ibid*.) Here the trial court erred because it strictly construed the opposing evidence in granting summary judgment.

## II.    Applicability of Section 1799.107

As noted above, section 1799.107 protects firefighting personnel when they are actually engaged in providing "'emergency services,'" a term expressly defined in the statute to include "first aid and medical services, rescue procedures and transportation, and other related activities necessary to insure the health or safety of a person in imminent peril." (*Id.*, subd. (e).) Borel does not concede the firefighters at the scene were providing emergency services because there was no one "in imminent peril" when they arrived and they themselves did not believe there was any danger. Borel points to the firefighters' own deposition testimony, in which they admitted that, prior to the blast, they did not believe anyone was in imminent peril. They all believed the gas from the ruptured line was dissipating into the atmosphere rather than going inside the home. Indeed, Lopez admitted they were not engaged in any activities to ensure the safety of persons in imminent peril when the blast occurred.

We see it differently. While "[t]he general rule of statutory construction is that a legislative grant of privilege or immunity is strictly construed against the

7

grantee[,]" (*Katsaris v. Cook* (1986) 180 Cal.App.3d 256, 265), the Legislature's language here supports application of the immunity statute. Pursuant to section 1797.70, an "emergency" for purposes of the immunity statute[3] "means a condition or situation in which an individual has a need for immediate medical attention, or *where the potential for such need is perceived by emergency medical personnel* or a public safety agency." (§ 1797.70, italics added.) Captain Chanley testified the Gas Company gave his crew clearance to exit the scene before the explosion. Yet they decided to stick around in case they were needed. Captain Chanley said it was his department's practice to remain on scene until the gas operator had shut down the gas leak. This was "in case something happen[ed]," though he did not make clear what those "somethings" might be. This testimony demonstrates the fire crew's perception that their services might be required so long as the leak remained active.

We also question whether the firefighters' subjective belief regarding imminent peril is determinative of whether imminent peril actually exists. Peril is a state of being, not necessarily a state of mind. To be exact, it is "the situation or state of being in imminent or fearful danger" or "a position of jeopardy." (Webster's 3d New Internat. Dict. (1981) p. 1680.) And the term "imminent" means "ready to take place," "near at hand," or "impending." (*Id.* at p. 1130.) It is possible for someone to be completely oblivious to an imminent peril. And so it was here. Just because the firefighters sensed no danger close at hand doesn't mean it wasn't lurking. Based on subsequent events, everyone in the vicinity of the home was in imminent peril that afternoon, though they may not have known it at the time.

Additionally, the immunity applies to those providing services "necessary to *insure* the health or safety of a person in imminent peril." (§ 1799.107, subd. (e), italics added.) "Insure" is another form of the word "ensure," which means, among other

---

[3] This definition is found within Chapter 2 of Division 2.5 of the code and "govern[s] the provisions" of said division – including section 1799.107 – "[u]nless the context otherwise requires." (§ 1797.50.)

things, "to make sure, certain, or safe" or to "guarantee." (Webster's 3d New Internat. Dict. (1981) pp. 756.) The point in time at which the public's health or safety is "insured" at the scene of a gas leak is one we are ill-equipped to measure as a matter of law. We would be loath to encourage emergency personnel to leave the scene because they *think* people are probably out of harm's way. The Legislature wisely endorsed them staying on scene to *insure* safety. They must decide when it is safe for them to go.[4]

But perhaps most glaringly, Borel's response to the City's requests for admission all but establish the point he now contests. The City asked him to: "Admit that CITY OF MURRIETA's role at the scene of the INCIDENT was to act to insure the health or safety of the persons in the area." Without qualification or objection, Borel admitted the request. "Any matter admitted in response to a request for admission is conclusively established against the party making the admission in the pending action, unless the court has permitted withdrawal or amendment of that admission . . . ." (Code Civ. Proc., § 2033.410, subd. (a).)

Borel attempts to negate the evidentiary effect of his response by arguing the statement involved a "mixed question of fact and law" inappropriate for resolution on summary judgment. We disagree. His admission resolved any mixed question of fact, if any ever existed on this issue.

"Code of Civil Procedure section 2033.010 allows any party to a civil action to obtain discovery 'by a written request that any other party to the action admit . . . the truth of specified matters of fact, opinion relating to fact, *or application of law to fact.*' (Italics added.) Thus, 'when a party is served with a request for admission

---

[4]     This is not to say we endorse blanket application of the immunity statute to every situation involving emergency rescue personnel. We can envision clear scenarios in which emergency services are no longer being provided, and thus, immunity would no longer attach. For instance, had the firefighters gone to eat their lunch at a park nearby, or had they stopped into a neighbor's house for a social call, they would no longer be providing emergency rescue services. We do not have such a scenario here, however. Whether they were physically active before the blast is less relevant in light of the dangers which later became tragically clear. So long as the clear objective of the firefighters' *presence* at the scene was insuring the health and safety of those in the area, they are covered.

9

concerning a legal question properly raised in the pleadings he cannot object simply by asserting that the request calls for a conclusion of law. He should make the admission if he is able to do so and does not in good faith intend to contest the issue at trial, thereby "setting at rest a triable issue." [Citation.] Otherwise he should set forth in detail the reasons why he cannot truthfully admit or deny the request. [Citation.]' (*Burke v. Superior Court* (1969) 71 Cal.2d 276, 282; see *Cembrook v. Superior Court* (1961) 56 Cal.2d 423, 429.)" (*Joyce v. Ford Motor Co.* (2011) 198 Cal.App.4th 1478, 1488-1489.)

If Borel had any concern about the nature of the question or how an admission could be interpreted, he should have said as much in his response. Or, he should have moved to withdraw the admission. But once established, facts admitted in response to requests for admission may not be negated by contradictory evidence. (See *Stover v. Bruntz* (2017) 12 Cal.App.5th 19, 30.)

Here, Borel admitted the fire crew's "role" at the scene was to insure the health and safety of persons in the area. Though often issues of duty come into play when dealing with the "role" of public entities, the City's question, at its heart, was factual in nature. It goes to the purpose for the crew's presence there; why did they come and why would they have stayed after being told they could go? We surmise both the City and Borel would give the same answers to those questions. Indeed, we surmise *most* people would – why else would a fire crew show up at the scene of a gas leak and stick around while work was being done if not to ensure the health and safety of residents?

Borel also argues the City, in its separate statement, misrepresented his response by claiming he had admitted the City's "*response* to the incident was to insure the health and safety of persons imperiled by the dangers presented by the gas leak." (Italics added.) But this was not a misrepresentation. If the crew's *role* at the scene was to insure the health and safety of persons in the area, surely its response to the incident was calculated to fulfill this role.

We conclude the City met its burden to bring section 1799.107 into play.

10

**III.**        **Gross Negligence**

Once the City met its moving burden to show section 1799.107 immunity attached, the burden of production shifted to Borel to rebut the presumption of good faith and lack of gross negligence bestowed by subdivision (c) of the statute. We conclude he successfully did so by raising triable issues of material fact regarding gross negligence.

We start by attempting to define the scope of "gross negligence" as the Legislature likely meant it under section 1799.107, subdivision (c). We must try to "give effect to the usual, ordinary import of" the phrase and construe it "in context in light of the nature and obvious purpose of the statute" itself. (See *Decker v. City of Imperial Beach* (1989) 209 Cal.App.3d 349, 354 (*Decker*).) As the California Supreme Court stated when construing this very statute twenty years ago, the phrase "gross negligence" has been defined in the case law as "''" the want of even scant care or an extreme departure from the ordinary standard of conduct."''" (*Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175, 1185-1186, quoting *Franz v. Board of Medical Quality Assurance* (1982) 31 Cal.3d 124, 138 and *Decker*, *supra*, 209 Cal.App.3d at p. 358.)

Gross negligence is to be distinguished from ordinary negligence, which "consists of a failure to exercise the degree of care in a given situation that a reasonable person under similar circumstances would employ to protect others from harm." (See *City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 753-754 (*City of Santa Barbara*).) When resolving motions for summary judgment, trial courts must "maintain[] a distinction" between the two. (*Id.* at p. 767.)

"Generally it is a triable issue of fact whether there has been such a lack of care as to constitute gross negligence . . . but not always." (*Decker, supra,* 209 Cal.App.3d at p. 358.) Because of the statutory presumption in section 1799.107, subdivision (c), it is Borel who must produce evidence showing gross, not ordinary, negligence by a preponderance of the evidence. (See Evid. Code, § 115.)

11

The cases discussing gross negligence in the context of summary judgment tend to appear more often than not in the sphere of primary assumption of risk, especially following the California Supreme Court's ruling in *City of Santa Barbara*, in which our high court held a contractual release of liability for all negligence, including gross negligence, was unenforceable. (*City of Santa Barbara, supra,* 41 Cal.4th at pp. 779-780.) In order to overcome a primary assumption of risk defense, the plaintiff must show the defendant's negligence transcends the ordinary and drifts into the territory of gross. In these cases, courts have most often affirmed grants of summary judgment where the plaintiff had *no* evidence showing an extreme departure from the standard of care (see *Joshi v. Fitness Internat., LLC* (2022) 80 Cal.App.5th 814, 828-829 [plaintiff could not recover against health club even though it knew sauna needed light bulb replaced prior to her trip and fall accident]; *Brown v. El Dorado Union High School Dist.* (2022) 76 Cal.App.5th 1003, 1029 [high school football player could not recover against school district for traumatic brain injury suffered during game because he was warned about injury and coaches were taking steps to monitor players during game]; *Honeycutt v. Meridian Sports Club, LLC* (2014) 231 Cal.App.4th 251, 259-260 [kickboxing student could not recover against health club when her kickboxing instructor held her leg to guide her on proper execution of roundhouse kick]; *Anderson v. Fitness Internat., LLC* (2016) 4 Cal.App.5th 867, 884-885) [health club patron could not recover for injuries suffered when he slipped on a shower floor which could be expected to be covered with soap residue], or where the plaintiff merely showed the defendant might have done better. (See *Decker*, *supra*, 209 Cal. App.3d at p. 361 [surfer drowned after rescue personnel allegedly used an ineffective rescue technique]; *Willhide-Michiulis v. Mammoth Mountain Ski Area, LLC* (2018) 25 Cal.App.5th 344, 364-365 [skier was injured when snowcat operator allegedly drove too fast down ski run and collided with her].)

In contrast, grants of summary judgment are often reversed where there is evidence that *could* show a want of even scant care or extreme departure from the

12

standard of care. (See *Eriksson v. Nunnink* (2011) 191 Cal.App.4th 826, 857 [equestrian student could recover against instructor who knowingly allowed her to ride a horse the instructor knew to be unfit].) The court's task in such cases is to determine whether, viewing the evidence in the light most favorable to the plaintiff, the defendants' conduct could reasonably be seen by a jury as an extreme departure. If so, summary judgment cannot be granted. At that point, whether or not the defendants were indeed grossly negligent becomes a question for the jury. (See *Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 555.) We find Borel's evidence falls into this latter category.

There are, of course, some different considerations in the public entity immunity context, as compared to the primary assumption of risk context. In *County of San Diego v. Superior Court* (2015) 242 Cal.App.4th 460, a case involving hazardous recreational activity immunity under Government Code section 831.7, the court refused to apply the gross negligence exception because it found the county did not act negligently when plaintiff was injured while using a rope swing over a ravine filled with tree debris. The court noted the immunity existed to encourage public entities to open their land for recreational use without fear of liability from those engaging in inherently dangerous activities on the land. (*Id.* at p. 468.) By this reasoning, the county should not be liable if parkgoers did not use due care while using the land.

In *Mubanda v. City of Santa Barbara* (2022) 74 Cal.App.5th 256, the court affirmed summary judgment in favor of the city based on Government Code section 831.7 after plaintiff's son died while paddleboarding in the harbor. (*Id.* at p. 259.) It found the gross negligence exception did not apply because drowning is an inherent risk of paddleboarding and the city had taken numerous steps to make the activity safer. They had posted signs, maps, and tips to paddleboarders, provided training, required paddleboarders to have certain safety equipment with them, and regularly patrolled the harbor. (*Id.* at pp. 264-265.)

13

Our review here is informed by our conclusion section 1799.107 was clearly designed to encourage emergency personnel to engage in life-saving activities without fear of being held liable for injuries they cause – a point ably made by Borel's counsel in the trial court. But we cannot find anything in our record to support a finding they were engaged in such active rescue activity. We therefore conclude the presumption has been sufficiently rebutted to allow the question of whether there has been gross negligence to go to the jury.

### A. The Miller Declaration

We feel compelled first to address the centerpiece of Borel's evidence in opposition to summary judgment: a declaration submitted by his firefighting expert John Miller. The parties seem to disagree on whether we should consider it in our analysis.

Miller opined that Captain Chanley, Lopez, and Stang's conduct prior to the explosion represented an extreme departure from the standard of care. The City objected strenuously to the declaration on numerous grounds, including foundation, relevance, and speculation. The trial court overruled the foundation and relevance objections, but sustained the speculation objection because it determined Miller had not connected the factual predicates he discussed to his proposed conclusion.[5] As a result, it granted summary judgment.

Borel did not appeal the court's evidentiary ruling, and didn't argue in his opening brief it was incorrect. The City, in its responsive brief, pounced on this, and argued any quibble with the court's evidentiary ruling has thus been waived. The City is correct on this. "Issues do not have a life of their own: if they are not raised or supported by argument or citation to authority, we consider the issues waived." (See *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99.)

---

[5] We find this a strained reading of the declaration, contrary to the liberal construction we are required to give opposing declarations.

14

Borel contends he waived nothing because the trial court sustained only one of the City's objections to the Miller declaration, as opposed to all of them. But one sustained objection was all the City needed to get the declaration excluded. In fact, the minute order indicates all six of the City's objections to the Miller declaration were sustained. We must consider the Miller declaration a nullity for purposes of our review.

## B. The Undisputed Facts

However, the other evidence Borel marshaled in support of summary judgment was enough.[6] The City does not dispute that natural gas is a hazardous material, and concedes its firefighters knew it was flammable. And even if they had not admitted as much, this fact is so widely known as to be potentially judicially noticeable.

The evidence indicates the firefighters were not aware the gas had migrated inside the home and believed it was dissipating into the atmosphere. As such, they did not think bystanders or any in the vicinity required protection. They were also clearly relying on the Gas Company to remediate the leak. But we are still left to wrestle with the question of why they stayed on the scene. Captain Chanley indicated it was policy to do so "in case something happen[ed]." The necessary follow-up question then is: what did they think might "happen"? The evidence suggests the fire crew knew there was an ongoing risk from the gas leak and knew what consequences might result. Yet they admit they took no steps to keep people away from the danger. If you were there in case something happened, it is hard to explain why you allowed people inside and next to the house.

---

[6] In addition to the record evidence, Borel has submitted deposition testimony from Sergio Flores, an employee of the Gas Company, which was taken on June 6, 2022, seven days before this appeal was filed. Obviously, the trial court never had occasion to review this document in connection with its ruling. Borel requests judicial notice of the deposition as a "'self-authenticating'" document under *Rialto Citizens for Responsible Growth v. City of Rialto* (2012) 208 Cal.App.4th 899, 915, fn. 5 (*Rialto*). Unlike in *Rialto*, however, the City opposes judicial notice, arguing the transcript contains hearsay. The *Rialto* court never explained why judicial notice of the deposition transcript therein was appropriate. We deny the request for judicial notice.

Since most people use or own natural gas-powered grills or stoves, and are aware that natural gas ignites easily, we do not think expert testimony is necessary for a reasonable juror to conclude no one should have been permitted within a certain radius of the gas leak. Even more egregious, in the eyes of a reasonable juror, could be the decision to allow Mrs. Haaland to go back into the house to retrieve items. Captain Chanley did not know whether the gas leak had been stopped. At the same time, he knew Mrs. Haaland could introduce another potential ignition source through static electricity or through misadventure. It is difficult to reconcile.

The City may argue the firefighters' action and lack thereof represents a mere departure from the ordinary standard of care, rather than an extreme one. That may be a successful argument. But a reasonable jury might also conclude this was not a mere departure from the standard of care but a complete abandonment of the standard of care – in other words, gross negligence. We conclude the decision ought to be left to them.

## DISPOSITION

The judgment is reversed and the trial court is directed to enter an order denying the City's motion for summary judgment, or alternatively, summary adjudication. Appellant to recover his costs on appeal.

BEDSWORTH, J.

WE CONCUR:

O'LEARY, P. J.

SANCHEZ, J.

16